IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Kyle Brundy,<br><br>       Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Co.,<br><br>       Defendant. | Case No. 8:23-cv-238<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Kyle Brundy ("Brundy") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended ("ADA").

## PRELIMINARY STATEMENT

1. Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even when the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removes employees who disclose health conditions, or who Union Pacific suspects may have health conditions, from service. Union Pacific then subjects the employee to a Fitness-for-Duty evaluation, again regardless of whether the employee has been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is capable of performing the essential functions of his or her

position, and Union Pacific does not conduct physical examinations of employees. Furthermore, Union Pacific routinely disregards the opinions of outside doctors who do conduct physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," regularly and arbitrarily concluding that the employee is unfit for duty because of a disability, and issuing unnecessary work restrictions it then refuses to accommodate.

2. In February 2016, several Union Pacific employees commenced a class-action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Co.*, Case No. 8:16-cv-381 (D. Neb.). The District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3. Brundy is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified and safely performing his job without incident, Brundy was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific because of a disability. Brundy was a class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant is headquartered in Omaha, Nebraska.

6. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because employment records relevant to Defendant's unlawful employment practices are maintained and administered in Omaha, Nebraska, and because Union Pacific's principal office is in Omaha, Nebraska.

## THE PARTIES

7. Brundy resides in Pocatello, Idaho. He was an employee of Union Pacific working in Pocatello, Idaho.

8. Union Pacific is a railroad carrier engaged in interstate commerce and has operations in Pocatello, Idaho and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10. The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels "Reportable Health Events." (Exhibit A.) This includes, but is not limited to, eye surgeries, such as injections for glaucoma and cataracts, or laser treatments of the cornea and/or retina.

3

11. Union Pacific's Fitness-for-Duty and "Reportable Health Events" policies are even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns or suspects that the employee has, or has had in the past, a listed or non-listed health condition, or because a manager refers the employee for a Fitness-for-Duty evaluation based on a belief that an employee may have such a health condition.

12. Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for Duty that are not included within the Medical Rules. For example, Union Pacific uses a "1% rule" that disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation. Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not "normal," based on an indication that the employee may have a cardiac condition, however minor. On information and belief, Union Pacific maintains other, similar policies that it uses to screen out employees with disabilities for failing to meet a discriminatory qualification standard.

13. When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

4

> **Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

14. These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

15. Union Pacific does not directly examine employees during Fitness-For-Duty evaluations.

16. Union Pacific routinely disregards the opinions of the employee's treating medical provider(s), and other medical providers who have physically examined the employee, and instead makes broad requests for medical information, including medical records, from the employee.

17. Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department ("Health and Medical Services"), located in Omaha, Nebraska, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

18. Health and Medical Services routinely issues Fitness-for-Duty decisions that disqualify employees from their positions because of a disability, even though the disability does not affect the employee's ability to safely perform the essential functions of the employee's job (or other positions for which the employee may also be qualified).

19. Health and Medical Services also uses discriminatory qualification standards, tests, and/or other selection criteria to exclude individuals with disabilities from their positions.

20. When issuing Fitness-for-Duty determinations, Health and Medical Services relies on standardized protocols for employees with certain broad categories of health conditions or treatments, and it assigns standardized work restrictions to employees.

21. For example, as part of these standardized protocols, Health and Medical Services regularly relied on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook ("the Handbook"), which the company downloaded from the FMCSA website, to determine which health conditions required work restrictions, which standard restrictions to impose, and how long restrictions should remain in place.

22. Union Pacific's then-Chief Medical Officer Doctor John Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

23. The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

24. In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website.

25. By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website and no longer endorsed its use.

26. Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

27. Union Pacific also represented to Courts, including in the *Harris* action, that the 2014 Medical Examiner's Handbook was reliable guidance and supported its decisions to impose standardized work restrictions on its employees. For example:

   a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification at 21, *Harris v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

   b. "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018, *Harris v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

   c. "Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Decl. of Dr. John Holland dated Oct. 2, 2018, at 6, *Harris v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

28. Through its Fitness-For-Duty program, Union Pacific removes employees from service based on medical conditions it learns or believes an employee may have or may have had in the past, whether or not such conditions actually interfere with the employee's ability to perform the essential functions of their position, and without making a good-faith effort to determine whether a reasonable accommodation exists.

29. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced

7

to disclose sensitive medical information, stay off work without pay, and many have lost their livelihoods.

## *PLAINTIFF KYLE BRUNDY*

30. Brundy was hired by Union Pacific on March 16, 2006 as a laborer and subsequently worked as an equipment operator and truck driver.

31. Most recently, Brundy worked for Union Pacific as a track thermite welder in Pocatello, Idaho. Over his nearly 11-year career with Union Pacific, Brundy performed his job duties ably and safely.

32. For years, Brundy received eye injections to treat a condition known as neovascularization—an abnormal growth of new blood vessels in the eye—which Union Pacific had known about since at least 2012. Brundy also has myopia, or nearsightedness, for which he wears corrective lenses. Brundy lived and worked with these eye conditions for years without incident.

33. Brundy received his Class B Commercial Driver's License ("CDL") in December 2015. He has renewed his CDL and still holds it to this day.

34. On February 23, 2017, in a letter from Carl L. Garrison, a Union Pacific superintendent, Union Pacific notified Brundy that he was removed from service because a manager, John Dahlke, claimed that Brundy allegedly needed to undergo a Fitness-For-Duty Evaluation to assess his ability to do his job.

35. In March 2017, Brundy's treating physician, Dr. Eric Romriell, D.O., cleared Brundy to return to work with no restrictions, noting that Brundy's visual acuity was sufficient to meet both CDL requirements and Union Pacific's requirements.

36. Despite Dr. Romriell's clearance, in or around April 2017, Union Pacific's then-Chief Medical Officer, Dr. John Holland, placed permanent work restrictions on Brundy that prohibited him from returning to work as a track thermite welder (among other positions for which Brundy was qualified).

37. The permanent work restrictions were as follows: (1) Not to operate company vehicles/on-track or mobile equipment/fork-lifts; (2) Not to operate cranes, hoists, or machinery; (3) Not to work on or near moving trains, freight cars, or locomotives; (4) Not to work at unprotected heights, over 4 feet above the work surface; and (5) If a new job assignment is considered, then HMS should review the functional job demands to determine if Brundy can safely perform the essential functions of the job.

38. At no time during this process, or after, did Dr. Holland, or any doctor affiliated with Union Pacific, physically examine Brundy.

39. Upon information and belief, at no time during or after the Fitness-for-Duty process did Dr. Holland, or any doctor affiliated with Union Pacific, speak with any of Brundy's treating doctors, including Dr. Romriell, who had cleared him to return to work.

40. In a letter dated April 13, 2017, and signed by Terry Owens, Union Pacific's Director of Disability Management, Union Pacific further informed Brundy that his "supervising department has been unable to identify a reasonable accommodation," and enclosed a document entitled, "What are my options now that I am unable to return to my railroad job?"

41. After Brundy was informed of his permanent work restrictions, he sought an accommodation to work in other positions at Union Pacific that would fit within his restrictions. He inquired about a dispatcher position in Nebraska, but nothing came of his

inquiry. Because of the onerous work restrictions Union Pacific imposed on him, Brundy considered further efforts to seek accommodations to be futile.

42. In the time since it imposed permanent work restrictions on Brundy, Union Pacific has persisted in its refusal to allow Brundy to return to his job.

43. Since May 2017, Brundy has worked as a truck driver and as a machine operator, earning less than what he made while employed by Union Pacific. Brundy has also successfully renewed and maintained his CDL license to the present date.

44. Brundy remains capable of working in his former position as a track thermite welder to this day.

45. On February 19, 2016, counsel for Brundy, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Harris v. Union Pacific Railroad Co.*, Case No. 8:16-cv-381 (D. Neb.).

46. Because he was a class member in the *Harris* case, Brundy's disability discrimination claims have been subject to tolling during the pendency of the class action, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

47. This Court certified the *Harris* class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

48. As a result of *Crown, Cork* tolling, Brundy had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued

its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Brundy's and other class members' claims by an additional sixty (60) days. Brundy timely filed a charge of discrimination with the EEOC on April 10, 2020. On May 26, 2023, the EEOC issued Brundy a right-to-sue letter. Brundy now timely initiates the present lawsuit.

## CAUSES OF ACTION

### COUNT I

*VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(a)*
*DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

49. Brundy incorporates the foregoing paragraphs by reference.

50. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

51. At all relevant times, Brundy was an individual with a disability as defined by the ADA.

52. At all relevant times, Brundy had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

53. Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

54. Union Pacific discriminated against Brundy on the basis of disability by, among other things, removing him from service and imposing permanent work restrictions disqualifying him from his position because of a disability.

55. Because Union Pacific violated 42 U.S.C. § 12112, Brundy has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Brundy is also entitled to attorneys' fees and costs incurred in connection with these claims.

56. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Brundy and others similarly situated. As a result, Brundy is entitled to punitive damages.

## **COUNT II**

### *VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(b)(6)*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

57. Brundy incorporates the foregoing paragraphs by reference.

58. "'[D]iscriminat[ing] against a qualified individual on the basis of disability' includes . . . using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, . . . is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6).

59. Union Pacific discriminated against Brundy on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Brundy.

60. Union Pacific's qualification standards are neither job-related nor consistent with business necessity.

61. Because Union Pacific violated 42 U.S.C. § 12112, Brundy has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Brundy is also entitled to attorneys' fees and costs incurred in connection with these claims.

62. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Brundy and others similarly situated. As a result, Brundy is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE, Brundy prays for judgment against Union Pacific as follows:**

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4. Pre-judgment interest, as provided by law;

5. For Brundy's costs, disbursements, and attorneys' fees pursuant to law;

6. For an award of punitive damages;

7. For all relief available under the ADA;

8. For such other and further relief available by statute; and

9. For such other and further relief as the Court deems just and equitable.

Date: June 2, 2023                     **NICHOLS KASTER, PLLP**

s/Jacob C. Harksen
James H. Kaster* (MN # 53946)
    kaster@nka.com
Lucas J. Kaster* (MN # 396251)
    lkaster@nka.com
Jacob C. Harksen* (MN # 0400097)
    jharksen@nka.com
80 South Eighth Street
4700 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878

*Admitted in D. Neb.

**ATTORNEYS FOR PLAINTIFF**