IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KYLE BRUNDY,

        Plaintiff,

vs.

UNION PACIFIC RAILROAD COMPANY,

        Defendant.

**NO. 8:23-CV-238**

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS**

Plaintiff Kyle Brundy has sued his former employer defendant Union Pacific Railroad Company under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Filing 1. Brundy alleges he is a former member of the now-decertified *Harris* class that sued Union Pacific for violations under the ADA. Filing 1 at 10 (¶¶ 45–46); *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030 (8th Cir. 2020). Brundy brings two claims under the ADA against Union Pacific alleging disability discrimination due to disparate treatment. Filing 1 at 11–13 (¶¶ 49–62). Defendant seeks to dismiss Count II of the Complaint and parts of other claims. Filing 6. For the reasons stated herein, the Court grants Defendant's Motion.

## I. INTRODUCTION

### A. Factual Background

The Court considers the following nonconclusory allegations as true for the purposes of ruling on this motion. See *Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)). Kyle Brundy worked for

1

Union Pacific between March 16, 2006, and February 23, 2017, most recently as a thermite welder. Filing 1 at 8 (¶¶ 30–31, 34). He received his Class B Commercial Driver's License (CDL) in 2015 and still held it at the time the Complaint was filed. Filing 1 at 8 (¶ 33). For years, Brundy has had myopia and neovascularization,[1] which Union Pacific has known since 2012. Filing 1 at 8 (¶ 32). Brundy receives injections to treat his neovascularization and wears lenses to correct his myopia, but he has "lived and worked with these eye conditions for years without incident." Filing 1 at 8 (¶ 32).

On February 23, 2017, Union Pacific removed Brundy from service pending a Fitness-For-Duty (FFD) evaluation "to assess his ability to do his job." Filing 1 at 8 (¶ 34).[2] In March 2017, Brundy's treating physician cleared Brundy to return to work without restrictions,[3] "noting that Brundy's visual acuity was sufficient to meet both CDL requirements and Union Pacific's requirements." Filing 1 at 8 (¶ 35). However, in April 2017, without physically examining Brundy or consulting his personal doctors, Union Pacific "placed permanent work restrictions on Brundy that prohibited him from returning to work as a track thermite welder (among other positions for which Brundy was qualified)." Filing 1 at 9 (¶¶ 36–39). Union Pacific then informed Brundy that it "has been unable to identify a reasonable accommodation" that would allow Brundy to continue working. Filing 1 at 9 (¶ 40). Despite this, Brundy alleges that, "[a]t all relevant times, [he] had the requisite skill, experience, education, and other job-related requirements of his position" and "could perform the essential functions of his position with or without reasonable

---

1 Brundy describes myopia as "nearsightedness" and neovascularization as "an abnormal growth of new blood vessels in the eye." Filing 1 at 8 (¶ 32).

2 Brundy does not allege that any medical event caused his removal from service with Union Pacific.

3 Brundy does not allege that his physician had previously refused to clear him to return to work without restrictions.

accommodations." Filing 1 at 11 (¶ 52). As of the time of the Complaint, Brundy had worked as a truck driver and machine operator and successfully maintained his CDL. Filing 1 at 10 (¶ 43). Brundy alleges that he "remains capable of working in his former position as a track thermite welder to this day." Filing 1 at 10 (¶ 44).

Brundy alleges that he experienced disability discrimination due to Union Pacific's FFD policy. Filing 1 at 12 (¶ 59). The FFD policy applies "to all Union Pacific employees across the country." Filing 1 at 3 (¶ 9). "Fitness for Duty" is defined in Union Pacific's Medical Rules as "[a]bility to medically and functionally (including physical, mental, and/or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory agencies in accordance with federal and/or state laws." Filing 1-1 at 12. The FFD policy requires that "[i]f the employee experiences a [reportable] health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by [Union Pacific's Health and Medical Services Department (HMS)]." Filing 1-1 at 3. "Reportable health events" include diabetes, a "seizure of any kind," heart attacks, and "[n]ew use of hearing aids." Filing 1-1 at 13 (listing categories of conditions as "Cardiovascular," "Seizure or Loss of Consciousness," "Significant Vision or Hearing Change," "Diabetes Treated with Insulin," and "Severe Sleep Apnea"). The employee must also "[p]rovid[e], upon request, information from the employees [sic] health care provider." Filing 1-1 at 3. After receiving an employee's medical records, HMS "conducts a 'file review' and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty." Filing 1 at 5 (¶ 17).

HMS relies on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook to conduct FFD Evaluations, specifically "to determine which health

3

conditions required work restrictions, which standard restrictions to impose, and how long those restrictions should remain in place." Filing 1 at 6 (¶ 21). Brundy alleges that the Handbook "did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce." Filing 1 at 6 (¶ 23). He also alleges that, by 2015, HMS "learned" that the Handbook was "outdated" but continued to rely on it in its Medical Rules. Filing 1 at 6 (¶ 25).

### B.  Procedural Background

Prior to this suit, Brundy alleges that he was a class member in a class action suit (*Harris*) against Union Pacific alleging disability discrimination under the ADA. Filing 1 at 10 (¶ 46). An Amended Complaint was filed on behalf of the class in the District Court for the Western District of Washington on February 19, 2016. Filing 1 at 10 (¶ 45); *Harris v. Union Pacific R.R. Co.*, No. 16-381 (D. Neb. Feb. 19, 2016), ECF No. 20. The Amended Complaint described the class as:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

Case No. 16-381, ECF No. 20 at 17 (¶ 116). Among the many Counts asserted in the Amended Complaint were a disparate-treatment claim pursuant to 42 U.S.C. § 12112(a) and (b)(6), a disparate-impact claim pursuant to 42 U.S.C. § 12112(b)(6) and (b)(3), an unlawful-medical-inquiries claim pursuant to 42 U.S.C. § 12112(d)(4)(A), and a failure-to-accommodate claim pursuant to 42 U.S.C. § 12112(b)(5)(A). Case No. 16-381, ECF No. 20 at 21–25 (¶¶ 136–163).[4] The case was then transferred to this Court. Case No. 16-381, ECF No. 51 at 3.

---

[4] The plaintiffs in *Harris* brought other claims, *see* Case No. 16-381, ECF No. 20, but only their ADA claims are of interest in Brundy's lawsuit.

The *Harris* plaintiffs sought class certification for their disparate-treatment claim but not on their disparate-impact, unlawful-medical-inquiries, or failure-to-accommodate claims before a different judge of this Court. Case No. 16-381, ECF No. 241 at 22. When seeking certification, the plaintiffs described the class as "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action." Case No. 16-381, ECF No. 240 at 1. The class was certified in February 2019. *See* Case No. 16-381, ECF No. 307; *Harris v. Union Pac. R.R. Co.*, 2020 WL 4504392, at *1 (D. Neb. Aug. 5, 2020). The Eighth Circuit Court of Appeals reversed and decertified the class on March 24, 2020. *Harris*, 953 F.3d 1030. Brundy promptly filed a charge of discrimination with the EEOC on April 10, 2020, and the EEOC issued a right-to-sue letter on May 26, 2023. Filing 1 at 11 (¶ 48). Brundy filed a Complaint against Union Pacific with the Court on June 2, 2023. Filing 1.

Brundy alleges two counts of disability discrimination on disparate-treatment theories under the ADA. Count I asserts a claim under 42 U.S.C. § 12112(a), alleging that "Union Pacific discriminated against Brundy on the basis of disability by, among other things, removing him from service because of a disability." Filing 1 at 12 (¶ 54). Count II asserts a claim under § 12112(b)(6), alleging:

> Union Pacific discriminated against Brundy on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Brundy.

Filing 1 at 12 (¶ 59). In his prayer for relief, Brundy asks for monetary damages and other forms of relief, including an injunction to enjoin Union Pacific's policies. Filing 1 at 13–14.

On June 27, 2023, Union Pacific filed its Motion to Dismiss. Filing 6. Union Pacific seeks dismissal of any claim based on Brundy having an "actual disability" or a "record of disability" as defined by the ADA. Filing 6 at 1. Union Pacific also seeks dismissal of any claim that Union Pacific failed to grant Brundy a "reasonable accommodation" as required by the ADA. Filing 6 at 1. Union Pacific does not otherwise challenge Count I of Brundy's Complaint. *See generally* Filing 6. In addition, Union Pacific argues that Count II of Brundy's Complaint, although styled as a disparate-treatment claim, is actually a disparate-impact claim that is time-barred and must be dismissed. Filing 6 at 1.

## II.  ANALYSIS

### A.  Applicable Standards

The typical grounds for Rule 12(b)(6) motions are the insufficiency of the factual allegations offered to state claims. To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, "'threadbare recitals of the elements of a cause of action' cannot survive a [Rule 12(b)(6)] motion to dismiss." *Du Bois v. Bd. of Regents of Univ. of Minnesota*, 987 F.3d 1199, 1205 (8th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, as the Eighth Circuit Court of Appeals has explained, "A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 680-83). To put it another way, a court "must determine whether a plaintiff's complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1364 (8th Cir. 2022) (quoting *Braden v. WalMart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). Thus,

"[a] claim is plausible when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Christopherson v. Bushner,* 33 F.4th 495, 499 (8th Cir. 2022) (quoting *Iqbal,* 556 U.S. at 678). In contrast, "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (internal quotation marks and citations omitted). The Eighth Circuit Court of Appeals has cautioned that "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden,* 588 F.3d at 594.

In ruling on a Rule 12(b)(6) motion, a court must "accept 'the facts alleged in the complaint as true and draw[ ] all reasonable inferences in favor of the nonmovant.'" *Bauer,* 25 F.4th at 589 (citation omitted). On the other hand, "[m]ere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." *Richardson v. BNSF Ry. Co.,* 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted). A court also need not accept a pleader's "legal conclusions drawn from the facts." *Knowles v. TD Ameritrade Holding Corp.,* 2 F.4th 751, 755 (8th Cir. 2021).

Rule 12(b)(6) also permits dismissal when a claim is not cognizable under applicable law. See, e.g., *Couzens v. Donohue,* 854 F.3d 508, 517 (8th Cir. 2017) (dismissal was appropriate where Missouri did not recognize a claim for false light invasion of privacy); *Thomas v. Bd. of Regents of Univ. of Nebraska,* No. 4:20CV3081, 2022 WL 1491102, at *18 (D. Neb. May 11, 2022) (agreeing with defendant that the plaintiffs had failed to state a claim, because a disparate-impact claim is not cognizable under the Equal Protection Clause); *Freeney v. Galvin,* No. 8:19CV557, 2020 WL 229996, at *2 (D. Neb. Jan. 15, 2020) (finding the plaintiff failed to state a § 1983 claim

against the manager of his private place of employment because such a claim is not cognizable where a private person is not a state actor or engaged in joint action with the state or its agents). In such cases, the plaintiff failed to state a claim that was legally cognizable as opposed to factually plausible.

## B.  Preliminary Matters

Brundy moved to dismiss and both parties addressed a "failure-to-accommodate" claim in their briefs. Filing 6 at 1; Filing 7 at 20–21; Filing 11 at 19–21; Filing 13 at 11–18. Both parties agree that Brundy's Complaint did not allege a "failure-to-accommodate" claim. Filing 7 at 20; Filing 11 at 19. Thus, to the extent that Brundy's claim is for failure to accommodate, the claim is dismissed.

The true argument between the parties is not over whether the Court should dismiss a "failure-to-accommodate" claim that is not in the Complaint but whether evidence on accommodations is "relevant to a defendant's direct threat affirmative defense." Filing 11 at 20; Filing 13 at 12. Brundy contends that evidence on accommodations is relevant because "[f]ailure to provide or consider available accommodations can also support a finding of intentional discrimination, as it may raise an inference that an employer's claimed rationale is pretext for discrimination." Filing 11 at 20. Union Pacific responds that Brundy seeks to introduce failure-to-accommodate evidence to "resurrect his accommodation claim" and "impos[e] the burden on Union Pacific to prove there was no accommodation available to mitigate the direct threat." Filing 13 at 16–17.

The Eighth Circuit has referenced EEOC regulations to establish that the duty to accommodate only extends to employees who have an actual or record of disability:

> A person is disabled for purposes of an accommodation claim if he or she has "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual" ["actual" disability] or has "record of such an impairment." 29 C.F.R. § 1630.2(g)(1)(i) and (ii). *See also* 29 C.F.R. § 1630.2(o)(4) (providing that a covered entity "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong (paragraph (g)(1)(iii) of this section)").

*Hustvet v. Allina Health Sys.*, 910 F.3d 399 (8th Cir. 2018). As explained below, Brundy has not adequately alleged that he has an "actual" or "record of" disability. Even so, it is premature to rule on Union Pacific's request that the Court prohibit discovery or offering evidence of accommodations at this stage. Thus, the Court does not consider the scope of discovery or evidence at this time.

### C.  "Disability" Within the Meaning of the ADA

"To obtain relief under the ADA," an employee is "required to show that he was a disabled person within the meaning of the ADA, was qualified to perform the essential functions of his job, and suffered an adverse employment action because of his disability." *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009) (citation omitted). Brundy contends that he can recover because he was disabled within the meaning of the ADA, qualified to perform the essential functions of his job, and terminated because of his disability. Filing 1 at 11–12 (¶¶ 52–54).

Brundy alleges that he is disabled under all three of the definitions in the ADA, *i.e.*, that he is "actually disabled," has a "record of disability," and was "regarded as disabled" by Union Pacific. Filing 1 at 11 (¶¶ 50–51). Brundy alleges that his "neovascularization" and "myopia" are the impairments that constitute disabilities under the ADA. Filing 11 at 19. Union Pacific responds that "Brundy [ ] fails to allege that he suffers from an impairment that substantially limits a major life activity which is fatal to any claim based upon having an 'actual disability' or 'record of disability' under the ADA." Filing 6. Union Pacific seeks to dismiss "any claim based upon

[Brundy] having an "actual disability" or "record of disability" as defined by the [ADA]," but not any claims based on "regarded as" disability. Filing 6. Thus, the Court turns to the question of whether Brundy has sufficiently alleged that he is "disabled" within the meaning of the ADA.

### 1. Statutory Definitions of Disability

Disability discrimination is prohibited against "a qualified individual on the basis of disability" under the ADA. 42 U.S.C. § 12112(a). The ADA defines "disability" to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual ["actual" disability]; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). In addition, "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by" the ADA. 42 U.S.C. § 12102(4)(A).

Neither party disputes that Brundy alleged he is a "qualified individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* Filing 1 at 11 (¶ 52) ("At all relevant times, Brundy had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA."). Thus, the issue is determining whether Brundy adequately alleged that he has a "disability" within the meaning of the ADA. The Court holds that Brundy failed to sufficiently allege that he has an "actual" or "record of" disability.

10

2. *Brundy's Allegations of Disability*

    a.  Brundy Has Not Adequately Alleged that He Has an Actual Disability

Brundy contends that he "has plausibly alleged that he has an 'actual' disability." Filing 11 at 18. Union Pacific responds that Brundy failed to allege facts sufficient to establish "actual" disability. Filing 7 at 18. Actual disability requires "[1] a physical or mental impairment [2] that substantially limits [3] one or more major life activities of such individual." 42 U.S.C. § 12102(1) (bracketed numbering added).

    i.  Brundy Has Sufficiently Alleged that He Has a "Physical Impairment"

Brundy contends that "[i]t is reasonable to infer . . . that Brundy's physical conditions," myopia and neovascularization, "affected his vision such that [they] constituted [ ] physical impairment[s] within the meaning of the ADA." Filing 11 at 19. As evidence, Brundy cites his allegations in the Complaint that "he received eye injections to treat neovascularization . . . and wore corrective lenses for myopia." Filing 11 at 19. Union Pacific asserts that Brundy "does not allege facts to establish an 'actual' disability." Filing 7 at 18. Union Pacific further contends that Brundy "cannot meet th[e] baseline requirement" of alleging a physical impairment because his Complaint "mentions nothing about any specific impairment other than to vaguely assert he is 'an individual with a disability.'" Filing 7 at 19. The Court agrees with Brundy.

Although the ADA statute does not define "physical impairment," the Eighth Circuit has endorsed an EEOC definition: "Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." *Morriss v.*

11

*BNSF Ry. Co.*, 817 F.3d 1104, 1108 (8th Cir. 2016) (quoting 29 C.F.R. § 1630.2(h)(1)). In addition, "[t]he ADA prohibits an employer from discriminating against an individual on the basis of a presently existing 'physical impairment.'" *Id.* at 1113. Contrary to Union Pacific's contention that Brundy "mentions nothing about any specific impairment," the Complaint alleges that Brundy has myopia and neovascularization. Filing 1 at 8 (¶ 32); Filing 7 at 19. The Court will assume that neovascularization or myopia can qualify as a "physiological disorder or condition . . . affecting one or more body systems, such as . . . special sense organs" that is "presently existing." *Morriss,* 817 F.3d at 1108, 1113 (citing 29 C.F.R. § 1630.2(h)(1) and 42 U.S.C. § 12102(3)(A), (C)). However, to qualify as a disability, Brundy's impairment must also "substantially limit[ ] one or more major life activities. 42 U.S.C. § 12102(1)(A).

> ii.  Brundy Has Not Adequately Alleged a "Substantial Limitation" to a "Major Life Activity"

Brundy argues that "[i]t is reasonable to infer that, without injections and lenses provided by Brundy's treating physicians, Brundy's physical impairment would substantially limit at least one major life activity, *i.e.*, his sight." Filing 11 at 19. Brundy contends this inference would be "reasonable" because "[n]ot only must this Court accept all of Brundy's allegations as true and draw all reasonable inferences in his favor, this Court also must follow the ADA's directive to construe the statute as broadly as possible in favor of coverage." Filing 11 at 18. Union Pacific responds that Brundy "fails to allege anywhere in the Complaint that he is substantially limited in any major life activity." Filing 7 at 19. Union Pacific also contends that "[t]his pleading deficiency is dispositive and prohibits any claim by Brundy based upon an "actual" disability." Filing 7 at 19. The Court agrees with Union Pacific.

The ADA provides "Rules of construction" for the term "substantially limit." 42 U.S.C. § 12102(4)(B)–(E). The term "shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008," usually called the ADAAA. 42 U.S.C. § 12102(4)(B); *see also Morriss*, 817 F.3d at 1110 (noting that "in the ADAAA . . . Congress expressed an intent to provide 'broad coverage' of individuals with disabilities"). To "substantially limit one major activity," an impairment "need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* § 12102(4)(D). Finally, courts do not consider "the ameliorative effects of mitigating measures such as [ ] medication" or other aids to determine whether an impairment substantially limits any major life activity, with one exception: "The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity." *Id.* § 12102(4)(E). The EEOC has elaborated that "'substantially limits' is not meant to be a demanding standard" and "should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(i), (iii). However, "not every impairment will constitute a disability within the meaning of this section." *Id.* 1630.2(j)(ii). "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual . . . as compared to most people in the general population," and this "comparison . . . usually will not require scientific, medical, or statistical analysis." *Id.* 1630.2(j)(ii), (v). Ultimately, "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." *Id.* § 1630.2(j)(iv).

The ADA also provides a non-exhaustive list of "major life activities," including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and

working." 42 U.S.C. § 12102(2)(A). Major life activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." Id. § 12102(2)(B). EEOC regulations have elaborated that "the term 'major' shall not be interpreted strictly to create a demanding standard for disability. Whether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'" 29 C.F.R. § 1630.2(i)(2) (citation omitted).

The Court will not infer that "without injections and lenses provided by Brundy's treating physicians, Brundy's physical impairment[s] would substantially limit . . . his sight." Filing 11 at 19. The Court disposes of Brundy's claim that his myopia (nearsightedness) would substantially limit his sight without his lenses because "[t]he ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity" and because Brundy alleged that his doctor concluding "that Brundy's visual acuity was sufficient to meet both CDL requirements and Union Pacific's requirements"—a conclusion Brundy nowhere contests. 42 U.S.C. § 12102(4)(E); Filing 1 at 8 (¶ 35). Thus, because Brundy failed to allege his myopia substantially limits any major life activity, Brundy's myopia is not a disability within the meaning of the ADA.

The Court turns to Brundy's claim that his neovascularization substantially limits the major life activity of eyesight. Brundy does not allege any facts from which one could infer that his neovascularization substantially limits his sight "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Brundy alleges that "for years, [he] received eye injections to treat" his neovascularization. Filing 1 at 8 (¶ 32). Presumably, Brundy wants the Court to infer that any untreated neovascularization would substantially limit a person's sight, but he

does not allege that the eye injections are "mitigating measure[s]" or that Brundy would have inferior eyesight without the injections. *Cf.* 42 U.S.C. § 12102(4)(E). It may be that, without eye injections, Brundy's eyesight or another major life activity would be substantially limited. It may be that "an abnormal growth of new blood vessels in the eye," if left untreated, would substantially limit a person's eyesight. Brundy does not allege in his Complaint facts from which that inference can plausibly be drawn. Brundy also does not allege in the Complaint that his eyesight is inferior or would be inferior without injections "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). On a motion to dismiss, the Court is not permitted to perform independent research about neovascularization to determine whether Brundy's condition could plausibly limit his eyesight when Brundy does not allege that himself. The Court concludes that Brundy has failed to plead sufficient facts to allow the Court to make the required "individualized assessment" to determine "whether an impairment substantially limits a major life activity." *Id.* § 1630.2(j)(1)(iv).[5]

The Court will also not infer a substantial limitation because other factual allegations in Brundy's complaint contradict the notion that his sight is presently and substantially limited. Brundy alleges that his doctor cleared him to return to work without restrictions over six years ago, which belies any inference that his sight is presently and substantially limited. Filing 1 at 9 (¶

---

[5] In his Brief in Response to Defendant's Motion to Dismiss, "Brundy requests that the Court permit him to amend his complaint with respect to his allegations of disability" if the Court finds he has not alleged facts "sufficient to overcome Defendant's motion." Filing 11 at 19. The Court will not grant Brundy leave to amend based upon this statement in his brief, for reasons including the fact that Brundy fails to follow applicable local rules relating to amending his pleading. NECivR 15.1 ("A party who moves for leave to amend a pleading . . . must file as an attachment to the motion an unsigned copy of the proposed amended pleading that clearly identifies the proposed amendments"). The Court would entertain a Motion to Amend Brundy's Complaint as to a claim based on neovascularization, but not as to myopia, if he believes he can allege additional facts that show how his neovascularization substantially limits his eyesight. Such a motion would be subject to the ordinary opportunities for full briefing of the motion and any opposition under applicable rules and subject to the standards for amendment post-dismissal.

35). Moreover, Brundy alleges that he received his CDL in 2015, prior to his termination from Union Pacific, and "has renewed his CDL and still holds it to this day." Filing 1 at 8 (¶ 33). In addition, Brundy alleges that "at all relevant times" he "could perform the essential functions of his position with or without reasonable accommodations." Filing 1 at 11 (¶ 52). Absent specific allegations to the contrary, the Court will not infer that Brundy's neovascularization presently and substantially limits his neurological function while he alleges that he "remains capable of working in his former position as a track thermite welder to this day" without any accommodations. Filing 1 at 10 (¶ 44). Because there are insufficient facts from which the Court can infer that Brundy's neovascularization and myopia substantially limit a major life activity, and because such an inference contradicts his other allegations, the Court holds that Brundy has not sufficiently alleged "actual" disability. Brundy's "[m]ere conclusory statements" that he has an "actual" disability "are insufficient to support a reasonable inference that the defendant is liable." *Richardson*, 2 F.4th at 1068.

      b.   Brundy Has Not Sufficiently Alleged That He Has a "Record Of" Disability

Brundy contends that he "has plausibly alleged that he has . . . [a] 'record of' disability." Filing 11 at 18. Brundy states that "it is reasonable to infer" that his "physical conditions [of neovascularization and myopia], for which eye injections and corrective lenses were required, affected his vision such that it constituted a physical impairment within the meaning of the ADA . . . and that there is a record of the impairments ." Filing 11 at 19. He also argues that "without injections and lenses provided by Brundy's treating physicians, Brundy's physical impairment would substantially limit at least one major life activity, i.e., his sight." Filing 11 at 19. Union Pacific responds that Brundy failed to allege facts sufficient to establish a "record of"

disability. Filing 7 at 20. Union Pacific argues that Brundy failed to "mention[ ] anything about any specific impairment" and "only vaguely asserts he is 'an individual with a disability.'" Filing 7 at 21.

The definition of disability under the ADA includes "a record of such an impairment." 42 U.S.C. § 12102(1)(B). The Eighth Circuit has explained that "[h]aving a record of a qualifying impairment means that an employee 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *Taylor v. Nimock's Oil Co.*, 214 F.3d 957, 961 (8th Cir. 2000) (quoting 29 C.F.R. § 1630.2(k)); *see also Shklyar v. Carboline Co.*, 616 F. Supp. 3d 920, 924 (E.D. Mo. 2022) (quoting *Taylor*, 214 F.3d at 961), *aff'd*, No. 22-2618, 2023 WL 1487782 (8th Cir. Feb. 3, 2023). Thus, like under 42 U.S.C. § 12102(1)(A) ("actual" disability), Brundy must show that he previously had a history of or was misclassified as having an impairment that substantially limits a major life activity.

As discussed above, the Court will assume that neovascularization is an impairment within the meaning of the ADA. The Court will also assume that Brundy has a record of the impairment since he alleged that he has received neovascularization-related eye injections "for years." Filing 1 at 8 (¶ 32). Thus, the issue is whether Brundy alleged that his "record of" neovascularization is a record of an impairment that substantially limited any major life activity, namely his eyesight. As discussed above, the mere fact that Brundy has received injections for an eye-related impairment does not bear on whether his ability to see is limited or would be limited without the injections. In addition, Brundy does not allege that he has ever had any incident resulting from his neovascularization which could show a substantial limitation to his eyesight. He merely alleges that in February 2017, he was removed from service because his manager "claimed that Brundy allegedly needed to undergo a Fitness-for-Duty Evaluation to assess his ability to do his job."

17

Filing 1 at 8 (¶ 34). Brundy does not even allege that Union Pacific had concerns about his eyesight that caused it to order the FFD evaluation. Brundy failed to allege any facts from which the Court could infer a record of Brundy's neovascularization substantially limiting his eyesight.

Even though Brundy does not assert that his eye conditions substantially limit any major life activity other than his eyesight, the Court will consider whether he has alleged facts sufficient to infer any other substantial limitation. The major life activity that most closely mirrors his complaint is "working." 42 U.S.C. § 12102(2)(A). While Brundy alleges that Union Pacific removed him from service because of his disability, Filing 1 at 12 (¶ 59), Brundy does not allege that his ability to work was ever restricted; instead, he asserts that he "remains capable of working in his former position as a track thermite welder to this day." Filing 1 at 10 (¶ 44). Because Brundy does not allege that he ever lost the capability to work, the Court will not infer that an impairment substantially limited his major life activity of "working." Accordingly, Brundy has not alleged sufficient "factual content that allows the court to draw the reasonable inference that" Brundy has a "record of" disability. *Christopherson*, 33 F.4th at 499 (quoting *Iqbal*, 556 U.S. at 678).

In conclusion, Brundy has not sufficiently alleged that he had an "actual" or "record of" disability. 42 U.S.C. § 12112(a). Union Pacific did not seek to dismiss or otherwise discuss Brundy's claims that he was "regarded as" disabled by Union Pacific.[6] Any claim based upon Brundy having an "actual" or "record of" impairment is dismissed.

---

[6] The Court previously granted a Motion to Dismiss in an ADA case brought by another former-*Harris* plaintiff against Union Pacific. *See Carlton v. Union Pacific R.R. Co.*, No. 23-211, ECF No. 18 (D. Neb. Sept. 29, 2023). In that case, Union Pacific effectively conceded that the plaintiff was "regarded as" disabled and did not move to dismiss any claim based on the plaintiff being "regarded as" disabled. *Id.* ECF No. 13, at *7 (arguing that the plaintiff's claim was "a 'regarded as' claim and nothing else."). Because Union Pacific neither sought to dismiss nor otherwise discussed any claim based on "regarded as" disability in this case, the Court does not discuss the viability of Brundy's "regarded as" claim here.

18

### D.  The Nature of Count II

*1.  Contrary to Union Pacific's Contention, Count II Is Not for Disparate Impact*

Count II of the Complaint seeks relief for disability discrimination under 42 U.S.C. § 12112(b)(6). Union Pacific contends that Count II does not allege disparate treatment and "is actually a disparate *impact* claim." Filing 7 at 5 (emphasis in original).

Union Pacific argues that Brundy seeks "to disguise the claim as a disparate impact claim to avoid the statute of limitations" through "artful pleading." Filing 7 at 5; Filing 13 at 1. Brundy responds that Count II is a disparate-treatment claim because it asserts that Union Pacific's FFD evaluation program and other unwritten policies "intentionally screen[ed] him out of his job because of disability." Filing 11 at 5. The Court agrees with Brundy that Count II attempts to state a disparate-treatment and not a disparate-impact claim.

The "[g]eneral rule" for disability discrimination under the ADA is that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Section 12112(b)(6) specifies that "discriminat[ing] against a qualified individual on the basis of disability" includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability[.]" Count II specifically seeks relief on a disparate-treatment theory of liability for disability discrimination under § 12112(b)(6). Filing 1 at 12–13 (¶¶ 57–62).

The Supreme Court has "consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact." *Raytheon Co v. Hernandez*, 540 U.S. 44, 52 (2003). "Both disparate-treatment and disparate-impact claims are cognizable under the ADA," but the claims are distinct. *Id.* at 53.

19

Accordingly, the Supreme Court admonished that "courts must be careful to distinguish between these theories." *Id.*

The Supreme Court explained that "disparate treatment . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or other protected characteristic." *Id.* (cleaned up). Disparate-treatment claims require "evidence of the employer's subjective intent to discriminate" and "depend on whether the protected trait . . . actually motivated the employer's decision." *Id.* at 52–53 (cleaned up). The Eighth Circuit has elaborated: "In a disparate treatment case, the plaintiff must basically prove that he is a member of a protected class and that the defendant treated him less favorably than similarly situated non-minority employees in circumstances from which intentional discrimination can be inferred." *Hervey v. City of Little Rock*, 787 F.2d 1223, 1231 (8th Cir. 1986). The prima facie case for disparate treatment based on disability requires showing "(1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) a causal connection between an adverse employment action and the disability." *Lipp v. Cargill Meat Solutions Corp.*, 911 F.3d 537, 544 (8th Cir. 2018) (cleaned up).

Unlike disparate-treatment claims, disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Raytheon*, 540 U.S. at 52. "The factual issues, and therefore the character of the evidence presented, differ [from disparate-treatment claims] when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes." *Id.* at 53 (cleaned up). Disparate-impact claims do not require showing that "the protected trait . . . actually motivated the employer's decision." *Id.* at 52 (internal quotations and citation omitted). Instead,

20

"a facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a disparate-treatment case." *Id.* at 52–53 (cleaned up). The Eighth Circuit elaborated that "[t]o satisfy the elements of a prima facie disparate impact claim, plaintiffs must demonstrate: "(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two." *Williams v. Wells Fargo Bank, N.A.*, 901 F.3d 1036, 1040 (8th Cir. 2018).

Here, Brundy did not assert that there was a "facially-neutral personnel policy or practice," as required to assert a disparate-impact claims. *Williams*, 901 F.3d at 1040. To the contrary, Brundy asserted "intentional discrimination" due to what he alleged were "facially discriminatory standards, employment tests, and/or other selection criteria . . . that are intended to screen out individuals with disabilities, and which did screen out Brundy." *Hervey*, 787 F.2d at 1231; Filing 1 at 12 (¶ 59). Thus, Brundy alleged Union Pacific's "subjective intent to discriminate," which is consistent with a disparate-treatment claim. *Raytheon*, 540 U.S. at 53. Therefore, Brundy attempted to state a disparate-treatment claim and not a disparate-impact claim. Because Union Pacific does not argue that Brundy is time-barred from raising a disparate-treatment claim, and that is the kind of claim the Court finds Brundy attempts to assert in Count II, the Court need not analyze whether the statute of limitations would bar a disparate-impact claim.

### 2. *The Court Does Not Need to Determine Whether Disparate-Treatment Claims Are Legally Cognizable Under § 12112(b)(6)*

Union Pacific argues that controlling precedent fairly implies that 42 U.S.C. § 12112(b)(6) is for disparate-impact claims only. Filing 13 at 1–6. In addition, Union Pacific refers the Court to previous dicta from another Judge on this Court and persuasive authority from other District Courts

21

and Courts of Appeals to support its contention. Filing 13 at 3. Ultimately, Union Pacific asks the Court to "follow the many courts that have refused to extend § 12112(b)(6) to a disparate treatment theory and dismiss Brundy's § 12112(b)(6) claim." Filing 13 at 6. Brundy responds that disparate-treatment claims are viable under § 12112(b)(6). He contends that no precedent from the Supreme Court or the Eighth Circuit holds nor implies that disparate-treatment claims are unavailable under § 12112(b)(6). Filing 11 at 6, 10–11. Brundy also argues that the Court's previous dicta on the issue was incorrect and refers the Court to persuasive authority that supports his argument. Filing 11 at 6–7, 12. In addition, Brundy asserts that § 12112(b)(6) permits disparate-treatment claims as a matter of statutory interpretation. Filing 11 at 8–9. However, because the Court determines that Brundy has failed to state a plausible claim for relief, the Court does not need to decide whether a disparate-treatment claim can be viable under § 12112(b)(6).

### E.  The Sufficiency of the Pleading of Count II

The Court now considers whether Brundy pleaded sufficient facts to state a plausible claim for disparate treatment, assuming that disparate-treatment claims are viable under 42 U.S.C. § 12112(b)(6). Brundy contends that his Complaint "is sufficient to state a plausible claim that Union Pacific was using its Fitness-for-Duty policies to intentionally screen him out of his job because of his disability," thereby alleging disparate treatment. Filing 11 at 14. Brundy argues that he alleged sufficient direct and indirect evidence to show that Union Pacific's practices constitute disparate treatment. Filing 11 at 13–16. Union Pacific responds that "even were Brundy able to assert a disparate treatment claim pursuant to § 12112(b)(6), he cannot allege facts sufficient to establish such a claim." Filing 13 at 11.

The Supreme Court and the Eighth Circuit have "long recognized that a party may prove intentional discrimination under the ADA either by direct or indirect evidence." *Lipp*, 911 F.3d at

22

543 (internal quotations and citations omitted); *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015). Therefore, the Court must consider whether Brundy has sufficiently alleged facts that can serve as direct or indirect evidence of disparate treatment. The Court agrees with Union Pacific that he has not.

### 1. *Brundy Has Not Sufficiently Alleged Direct Evidence of Disparate Treatment*

Brundy contends that he has alleged sufficient direct evidence of intentional discrimination to plausibly state a claim for disparate treatment. Filing 11 at 14. Brundy refers the Court to the FFD policy as an example of direct evidence. Filing 11 at 14–15.[7] Brundy asserts the FFD policy can serve as direct evidence of disparate treatment because it is "facially discriminatory." Filing 11 at 14. Union Pacific responds that Brundy cannot show that the policy is facially discriminatory because the "FFD policy applies to all employees, regardless if they have a disability, and while some of these employees may be excluded from a job, Brundy readily alleges that some employees are returned to work." Filing 13 at 11.

The Supreme Court has stated that "a plaintiff can prove disparate treatment . . . by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic." *Young*, 575 U.S. at 213. This Court concludes that a policy that "relies expressly" on disability classifies by disability, *i.e.*, such a policy is facially discriminatory. *Id.* The Eighth Circuit has defined "direct evidence" somewhat differently as evidence "which shows a strong causal connection between the alleged discriminatory animus and the adverse employment action."

---

[7] Although Brundy points to the "1% rule" as "[o]ne such facially discriminatory policy utilized by Union Pacific to screen out employees based on their medical conditions," Brundy does not allege that he was ever subjected to the "1% rule." *See generally* Filing 11 at 14. Thus, the Court does not consider whether the "1% rule" can serve as evidence of disparate treatment in this case. *But see Carlton*, No. 23-211, ECF No. 18, at *30–31 (holding that Union Pacific's "1% rule" cannot serve as direct evidence of disparate treatment in a similar case brought by a former-*Harris* plaintiff).

*Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 63 F.4th 721, 727 (8th Cir. 2023). For example, the Eighth Circuit has explained that "[d]irect evidence can be circumstantial in nature and includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Id.* (internal quotations and citation omitted). The evidence "must be sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Id.* (internal quotations and citation omitted).

Brundy alleges that Union Pacific's policies are "facially discriminatory," by which the Court understand him to mean that the policies "rel[y] expressly" on disability and thus serve as direct evidence of disparate treatment. Filing 1 at 12 (¶ 59); Filing 11 at 14–15; *Young*, 575 U.S. at 213. However, Brundy never argues that he has "direct evidence" of the sort described by the Eighth Circuit in *Smothers*, because he nowhere alleges that there is evidence "circumstantial in nature" such as "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." 63 F.4th at 727 (internal quotations and citation omitted). Union Pacific argues that its policies are not facially discriminatory because they apply "equally to all employees [with and] without disabilities" and because some employees "who have a disability are subject to a lawful fitness-for-duty review and returned to work, meaning the policy does not automatically result in 'discrimination.'" Filing 7 at 11. Thus, the Court will examine the FFD policy to determine whether it "expressly relies on" disability.

The FFD policy aims to determine employees' "[a]bility to medically and functionally (including physical, mental, and/or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory

agencies in accordance with federal and/or state laws." Filing 1-1 at 2 (cleaned up). The FFD

policy applies to "all Union Pacific employees across the county." Filing 1 at 3 (¶ 9). After the

FFD evaluation, HMS determines whether "the employee is fit for duty, fit for duty with

restrictions, or unfit for duty." Filing 1 at 5 (¶ 17). The policy imposes several requirements on

employees:

> Reporting to work fit for duty to safely perform their jobs with or without
> reasonable accommodations;
>
> Notifying the supervisor when the employee becomes aware of or is concerned that
> a medical condition or symptom(s) exists which may affect his/her ability to safely
> perform his/her job;
>
> Undergoing a Fitness-for-Duty evaluation, including all medical tests,
> examinations, and evaluations deemed necessary by various governmental agencies
> and HMS;
>
> Providing, upon request, information from the employees [sic] health care provider
> including, but not limited to: medical documentation pertaining to medical tests,
> examinations, and/or evaluations, including lists of all prescription and over-the-
> counter medications taken by the employee. Employee may be required to provide
> information on a periodic basis for monitoring of continued fitness-for-duty.
>
> Providing, upon request, a statement from the employees [sic] healthcare provider
> whether or not, or in what circumstances, any prescriptions or OTC medications
> currently taken by the employee is likely to impair the employee's perceptual
> abilities or alertness, or impair mental or physical functioning;
>
> Performing all work in conformance with any medical restrictions that HMS has
> placed upon the employee;
>
> Meeting the requirements, in a timely manner, of all federal and state laws and
> regulations applicable to the employee with regard to medical evaluations and
> testing and the use of personal protective equipment;
>
> Providing accurate information to Health and Medical Services regaring [sic] health
> status and medical treatment;
>
> . . .
>
> Notify HMS as soon as practicable if he/she experiences any of the health events
> listed in Appendix B of these Medical Rules. A reportable health event is defined

as a new diagnosis, recent event or change in a prior stable condition, for one of the following (See Appendix B for more detail): a) Cardiovascular Conditions b) Seizure or Loss of Consciousness c) Significant Vision or Hearing Changes d) Diabetes Treated with Insulin e) Severe Sleep Apnea;

The employee should simultaneously notify his/her supervisor that he/she has experienced a health event, as defined in Appendix B, that requires a Fitness-for-Duty evaluation by Health and Medical Services prior to performing his/her job.

If the employee experiences a health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS[.]

Filing 1-1 at 3 (semicolons added).

As to whether anything on the face of the FFD policy "relies expressly" on disability, *i.e.*, whether the policy is "facially discriminatory," *Young*, 575 U.S. at 213, the Court finds that nothing in the FFD policy expressly relies on or classifies by "disability." *See generally* Filing 1-1. Indeed, Brundy does not specify which part of the FFD policy he believes expressly relies on disability. On the other hand, the FFD policy states that "[i]f the employee experiences a [reportable] health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS." Filing 1-1 at 3. It also lists as "reportable health events" medical conditions such as diabetes, a "seizure of any kind," "significant vision change in one or both eyes affecting visual acuity," and "[n]ew use of hearing aids." Filing 1-1 at 13 (listing categories of conditions as "Cardiovascular," "Seizure or Loss of Consciousness," "Significant Vision or Hearing Change," "Diabetes Treated with Insulin," and "Severe Sleep Apnea"). Consequently, the Court considers whether "reportable health event" operates as a stand-in for "disability" such that the classification in the FFD "expressly relies" on disability.

26

The Court finds that the FFD's reliance on "reportable health events" does not "expressly rely" on disability and is not "facially discriminatory." *Young*, 575 U.S. at 213. Instead, employees who have a "condition" that constitutes a "reportable health event" may not have an "impairment" that constitutes a "disability" within the meaning of the ADA. *Compare* 42 U.S.C. § 12102(1)(a) (defining disability to mean an "impairment that substantially limits one or more major life activities"), *with* Filing 1-1 at 13. For example, an employee who had a "significant vision change in one or both eyes affecting visual acuity," nonetheless might not have a "disability" within the meaning of the ADA if he is not "substantially limit[ed] [in] one or more major life activities." Filing 1-1 at 13; 42 U.S.C. § 12102(1)(a); *see also* Filing 1 at 11 (¶ 51) (despite his eye conditions, which may qualify as "significant vision change," Brundy alleges that "[a]t all relevant times, [he] had the requisite skill, experience, education, and other job-related requirements of his position [and] could perform the essential functions of his position with or without reasonable accommodations"). In addition, there may be employees with an ADA-defined disability who have never experienced a "reportable health event." For instance, not a single "mental impairment" that "substantially limits one or more major health activities of such individual" would fall under any category of "reportable health events." *Compare* 42 U.S.C. § 12102(1)(a), *with* Filing 1-1 at 13 (listing categories of conditions as "Cardiovascular," "Seizure or Loss of Consciousness," "Significant Vision or Hearing Change," "Diabetes Treated with Insulin," and "Severe Sleep Apnea"). Thus, the FFD policy is not facially discriminatory because classifying employees by "reportable health events" is not the same as classifying them by disability. Therefore, the FFD policy does not rely expressly on disability.

The FFD policy does not "rel[y] expressly" on disability. *Young*, 575 U.S. at 213. Rather, the FFD evaluations "lead[ ] to varying—and individualized—outcomes" for individuals with and

without disabilities. *Harris*, 953 F.3d at 1037. Therefore, Brundy's "[m]ere conclusory statements" that the FFD policy can serve as direct evidence of disparate treatment are insufficient. See *Richardson*, 2 F.4th at 1068.

### 2. Brundy Has Not Alleged Sufficient Indirect Evidence from which a Reasonable Person Could Infer Disparate Treatment Because of Disability

Brundy also claims that he has alleged sufficient indirect evidence of disparate treatment to state a plausible claim. Filing 11 at 15. Brundy argues that "there is no requirement that [he] prove the alleged policies are 'facially discriminatory'" but only that "the evidence in the complaint, when accepted as true, is sufficient to state a plausible claim that Union Pacific was using its Fitness-for-Duty policies to intentionally screen him out of his job because of his disability." Filing 11 at 13 (emphasis omitted). By this, the Court understands Brundy to argue that the Complaint also contains factual allegations which can serve as indirect evidence of disparate treatment. Brundy contends that it is reasonable to infer that Union Pacific intentionally discriminated against him from his allegations regarding "the lack of an individualized Fitness-for-Duty evaluation, Union Pacific's disregard of the opinions of Brundy's treating medical providers, and Union Pacific's continued reliance on a flawed [FMCSA] handbook." Filing 11 at 15. Union Pacific does not specifically address Brundy's claim that indirect evidence shows disability discrimination, but Union Pacific contends generally that Brundy "cannot allege facts sufficient to establish [a disparate-treatment] claim." Filing 13 at 11.

A plaintiff may "show disparate treatment through indirect evidence . . . through application of the *McDonnell Douglas* framework," which first "requires a plaintiff to make out a prima facie case of discrimination." *Young*, 575 U.S. at 228. Making out the prima facie case requires "showing actions taken by the employer from which one can infer, if such actions remain

unexplained, that it is more likely than not that such actions were based on a discriminatory criterion." *Id.* The Eighth Circuit has elaborated on the elements of a prima facie discrimination claim based on indirect evidence:

> Under the *McDonnell Douglas* framework, [an employee must show] the first three elements of a prima facie case of discrimination: (1) she is a member of a protected class; (2) she was qualified for her position and performing adequately; and (3) she suffered adverse employment actions. . . . [T]he fourth element [requires a] showing that the circumstances of these actions gave rise to an inference of discrimination. She may do so by presenting evidence of pretext. A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision.

*Smothers*, 63 F.4th at 728 (internal quotations and citation omitted).

Here, the Court assumes without deciding that Brundy can satisfy the first three elements of his prima facie case for disability discrimination. Although not challenged here, the Court assumes without deciding that Brundy adequately alleged that he was "regarded as" having a disability. 42 U.S.C. § 12102(1)(C). He alleged that he "had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA." Filing 1 at 11 (¶ 52). He also alleged that he was "remov[ed] . . . from service." Filing 1 at 12 (¶ 54). Thus, the question is whether Brundy can satisfy the fourth element by "showing that the circumstances of" relying on the FMCSA Handbook and on Brundy's medical records without an individual medical examination "gave rise to an inference of discrimination." *Smothers*, 63 F.4th at 728. The Court will consider whether either of these actions "present[ ] evidence of pretext." *Id.* Brundy does not allege that Union Pacific "failed to follow its own polices" or "shifted its explanation of the employment decision." *Id.* Therefore, the focus of the "pretext" analysis is whether Union Pacific "treated similarly-situated employees in a disparate

manner," *i.e.*, relied on the FMCSA Handbook and on employees' medical records instead of their treating physician's opinions or an individualized examination because Union Pacific wanted to exclude employees based on disability. *Id.*

The Court begins with the allegation that Union Pacific's reliance on the FMCSA Handbook can serve as indirect evidence of disparate treatment. The Court assumes that the Handbook, as Brundy alleged, "did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce." Filing 1 at 6 (¶ 23). The Court also assumes that, by 2015, Union Pacific knew "that the FMCSA removed the Handbook from its website and no longer endorsed its use" and that Union Pacific used the Handbook "as a basis to assign standardized work restrictions for its employees." Filing 1 at 6 (¶ 26).

First, regarding "circumstances of" reliance on the Handbook as purportedly "g[iving] rise to an inference of discrimination," *Smothers*, 63 F.4th at 728, Brundy only alleges the following:

> The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce. . . . In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website. . . . By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website and no longer endorsed its use. . . . Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

Filing 1 at 6 (¶¶ 23–26). However, Brundy has adduced no evidence to plausibly suggest that using the standards in the Handbook is inappropriate simply because it was intended for a different industry. *See generally* Filing 1. The Court observes that Brundy alleges that the Handbook was

designed for "drivers operating a commercial vehicle in interstate commerce," that is, designed for a plainly related transportation industry. Filing 1 at 6 (¶ 23). The heart of the issue is whether Union Pacific's reliance on the FMCSA Handbook "gave rise to an inference of discrimination" because it "treated similarly-situated employees in a disparate manner." *Smothers*, 63 F.4th at 728. In essence, Brundy wants the Court to hold that a reasonable person could "infer" that Union Pacific relied on safety standards from a federal agency concerning a related industry because it "more likely than not" intended to discriminate against disabled employees. *Young*, 575 U.S. at 228. Such an inference is simply not plausible, for the following reasons.

Brundy implies that Union Pacific relied on the Handbook as a "pretext" to discriminate against him and other disabled employees, *i.e.*, that Union Pacific relied on governmental safety information that was known to be "outdated" and intended for the commercial vehicle industry rather than the railroad industry so that Union Pacific could intentionally remove him from service. In effect, Brundy wants the Court to infer that: (1) Union Pacific adopted facially neutral[8] safety standards because it knew the standards would have the effect of disproportionately discriminating against disabled employees; (2) Union Pacific intended or desired this effect; (3) Union Pacific's reasons for relying on federal safety standards were not because Union Pacific believed that the standards would serve to protect its employees from workplace hazards; (4) any safety rationale for relying on the FMCSA is a mere pretext for disability discrimination; and (5) the fact that the Handbook was intended for the trucking industry rather than the railroad industry and that the Handbook was taken off the FMCSA website is evidence that Union Pacific's reliance on the

---

[8] Although Brundy alleges the FFD policy is "facially discriminatory," the Court rejected that argument in a preceding section. Filing 1 at 12 (¶ 59).

Handbook was pretext for intentional discrimination. The Court finds that this series of inferences is implausible.

Brundy also implies that the Court should require Union Pacific to contradict federal agency safety standards applicable to a related industry, which the Court is reluctant to do. *See Boersig v. Union Elec. Co.*, 219 F.3d 816, 822 (8th Cir. 2000) (noting that compliance with the employee's "argument would require an employer to accommodate a disabled employee by violating the express terms of a CBA"); Filing 1 at 13 (seeking "[a]n injunction against Union Pacific . . . from engaging in each of the unlawful practices, policies, customs, and usages set forth herein"). Moreover, if Brundy asserted that these standards merely have the effect (under a disparate-impact theory) of discriminating against Brundy and other disabled individuals, the Court would likely find his conclusion to the chain of inference more plausible. Instead, Brundy alleges that "it is reasonable to infer that Union Pacific intentionally discriminated against Brundy" by having these standards. Filing 11 at 16. The notion that Union Pacific would adopt federal safety standards because it intended to discriminate against disabled employees is not plausible.

The Court turns to the issue of determining whether Union Pacific's reliance on Brundy's medical records to conduct his FFD evaluation—instead of conducting its own examination of Brundy or adopting his doctors' opinions wholesale—constitutes indirect evidence of disparate treatment. Filing 11 at 15–16. Brundy does not explain why Union Pacific's reliance on his medical records to conduct an FFD evaluation is indirect evidence of discrimination, nor why conducting its own individualized FFD evaluations or adopting the opinions of his doctors would instead be non-discriminatory. Instead, Brundy simply asserts that "it is reasonable to infer that Union Pacific intentionally discriminated against Brundy." Filing 11 at 15. The necessary inference here would be that relying on medical records alone allows Union Pacific so much discretion to impose

restrictions based on disabilities as compared to conducting physical examinations or adopting the opinions of an employee's personal physician would be as to imply a discriminatory animus and demonstrate pretext. The Court also finds this allegation too removed from plausibility "to support a reasonable inference that the defendant is liable." *Richardson*, 2 F.4th at 1068. Therefore, Brundy has not sufficiently alleged any indirect evidence of disparate treatment.

Thus, neither Union Pacific's reliance on the FMCSA Handbook nor its reliance on Brundy's medical records are "actions taken by the employer from which one can infer . . . that it is more likely than not that such actions were based on a discriminatory criterion." *Young*, 575 U.S. at 228. Even when making all possible inferences in favor of Brundy, the Court holds that he has not sufficiently alleged indirect evidence of disparate treatment because the "factual allegations lack[ ] enough specificity to raise a right to relief above the speculative level." *Richardson*, 2 F.4th at 1068. Therefore, because Brundy failed to plead either direct or indirect evidence of disparate treatment, his disparate-treatment claim is dismissed for failure to state a claim upon which relief can be granted.

### III. CONCLUSION

For these reasons, the Court dismisses Count II, Brundy's disparate-treatment claim under 42 U.S.C. § 12112(b)(6), even though the Court finds that Brundy attempted to allege disparate treatment and not disparate impact. Count II must be dismissed because the Complaint fails to plead facts sufficient to state a disparate-treatment claim upon which relief can be granted. In addition, any claim based on Brundy having an "actual" or a "record of" disability is dismissed. Any claim based on a failure to accommodate is also dismissed. Count I, Brundy's disparate-treatment claim under 42 U.S.C. § 12112(a), is the only remaining count of Brundy's Complaint. Filing 1 at 11–12 (¶¶ 49-56). Accordingly,

IT IS ORDERED:

1. Defendant's Motion to Dismiss, Filing 6, is granted.


Dated this 11th day of October, 2023.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge